IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,          )
                                   )
                Plaintiff,         )
                                   )
-vs-                               )   No. 17-CR-094-GKF
                                   )
JOSE RAWDON TRUJILLO,              )
                                   )
                Defendant.         )

TRANSCRIPT OF REVOCATION HEARING

**BEFORE THE HONORABLE GREGORY K. FRIZZELL**

**UNITED STATES DISTRICT JUDGE**

JULY 20, 2020

A P P E A R A N C E S

        **Timothy L. Faerber**, Assistant U.S. Attorney, 110 West
Seventh Street, Suite 300, Tulsa, Oklahoma, 74119, attorney on
behalf of the Plaintiff;

        **Scott A. Graham,** Assistant Federal Public Defender,
One West Third, Suite 1225, Tulsa, Oklahoma, 74103, attorney on
behalf of the Defendant.

*REPORTED BY:*        *BRIAN P. NEIL, RMR-CRR*
                      *United States Court Reporter*

1          Monday, July 20, 2020

2                  * * * * *

3          **DEPUTY COURT CLERK:**  This is Case No. 17-CR-094-GKF,

4   United States of America v. Jose Rawdon Trujillo.  Counsel,

5   please state your appearances for the record.

6          **MR. FAERBER:**  Good morning, Your Honor.  Timothy

7   Faerber for the United States.

8          **THE COURT:**  Good morning.

9          **MR. GRAHAM:**  Morning, Your Honor.  Scott Graham for

10  Mr. Trujillo and he is present in custody.

11         **THE COURT:**  Good morning.  Mr. Graham, are there any

12  announcements as to any of these violations this morning?

13         **MR. GRAHAM:**  Your Honor, Mr. Trujillo would

14  stipulate that the government could prove by a preponderance of

15  the evidence the allegations in the petition, pointing out one

16  discrepancy Mr. Trujillo has, which is only the word "moved."

17  He disputes the word "moved."  However, as the allegation is

18  written, he doesn't dispute that he didn't follow the

19  instructions of the probation officer and he abandoned his

20  house and the stuff inside the house to go to New York and

21  Montana eventually.

22         So with that caveat, as written, all four of the

23  conditions he would stipulate to.

24         **THE COURT:**  All right.  Let me see if I understand

25  that distinction then from the allegations contained in alleged

1  violation No. 4.  I mean, it almost sounds like a renter

2  dispute as to whether or not he had truly abandoned the rental

3  unit.  I've read the letter of Officer Murdock, where it's

4  represented that new renters had come in and they were moving

5  out the defendant's belongings out of the unit.

6        So if I'm to understand correctly, you're stating that

7  he didn't actually move even though he had gone to Wagoner

8  Lake; right?

9              MR. GRAHAM:  Correct.

10             THE COURT:  All right.  But that's irrelevant

11 here --

12             MR. GRAHAM:  I agree.

13             THE COURT:  -- is it not?  Because whether he

14 formally moved out of the rental unit or not, he did, in

15 fact --

16             MR. GRAHAM:  Yes.  He violated the condition as

17 stated --

18             THE COURT:  Yes.

19             MR. GRAHAM:  -- and that's what we would stipulate

20 to.  I'm merely pointing out, at the request of Mr. Trujillo,

21 that "move" is a word we don't need to inject into the

22 allegation.

23             THE COURT:  Got it.  Got it.  And I'm sensitive to

24 that having seen a lot of disputes between landlords and

25 renters.  But he did, in fact, transport himself from that unit

1    to Wagoner Lake in his vehicle where he was essentially living
2    out of that vehicle for a period of time; correct?
3              MR. GRAHAM:   That's correct.
4              THE COURT:   Okay.  And I take it you've had
5    discussions with the defendant with regard to his right to a
6    hearing today?
7              MR. GRAHAM:   I have, Your Honor.
8              THE COURT:   And is he willing to waive, or give up,
9    his right to a disputed hearing?
10             MR. GRAHAM:   On these allegations, yes, Your Honor.
11   He does -- he had asked to address the court on some matters
12   that he believes has to do with the allegations but an
13   adversarial hearing we don't need.
14             THE COURT:   All right.  So you're talking about how
15   to address the violations he'd like to speak to me?
16             MR. GRAHAM:   Correct.
17             THE COURT:   Well, good.  Because I would like to do
18   that as well and evaluate his -- because of our history here in
19   this case I think I need to evaluate his competency.
20             MR. GRAHAM:   I agree.
21             THE COURT:   All right.  And let me ask Mr. Faerber:
22   With that understanding as to the word "moved" in alleged
23   violation No. 4, is there a need to call a witness here today?
24             MR. FAERBER:   No, Your Honor.  I understand
25   Mr. Trujillo's point.  We don't have any disagreement with him

1   on that.  We think we can proceed by stipulation.  So I don't

2   think there's any need to call a witness.

3              THE COURT:  Very good.  Mr. Trujillo, if you'll

4   approach, please.

5              THE DEFENDANT:  Judge, do you mind if I take this

6   off so I can speak?

7              THE COURT:  You may.

8              THE DEFENDANT:  Thank you.

9              THE COURT:  A little easier to speak, isn't it?

10             THE DEFENDANT:  It is.

11             THE COURT:  Mr. Trujillo, do you understand that you

12  have a right to a hearing on these alleged violations today?

13             THE DEFENDANT:  Yes, sir, I do.

14             THE COURT:  Do you understand you don't have to

15  stipulate, or agree, to any of these violations?

16             THE DEFENDANT:  I agree.  I totally agree.

17             THE COURT:  All right.  But do you understand that

18  you don't have to stipulate?

19             THE DEFENDANT:  Yes, I understand.

20             THE COURT:  All right.  And do you understand that

21  this petition for warrant alleges four separate violations of

22  your conditions of supervised release?

23             THE DEFENDANT:  Yes, sir.

24             THE COURT:  Have you received a copy of this

25  petition for warrant?

1    THE DEFENDANT:  I did.  But they threw them away at

2  the jail because I couldn't travel with them in the car so they

3  threw them away.  So if I can get another copy today, I'd

4  appreciate.

5    THE COURT:  Oh, I think that should be no problem at

6  all.  But did you receive a copy with all of the attached

7  exhibits?

8    THE DEFENDANT:  I did, Your Honor.

9    THE COURT:  Have you read it in its entirety?

10    THE DEFENDANT:  Yes, I have.

11    THE COURT:  All right.  And Mr. Graham has stated

12  here on the record that you're willing to stipulate; that is,

13  agree, to these four alleged violations with the exception of

14  the word "moved."  Is that correct?

15    THE DEFENDANT:  Yes, sir.

16    THE COURT:  All right.  So you and I need to go

17  through each one of these alleged violations.  And let me just

18  be absolutely sure here and ask you again:  Are you willing to

19  give up your right to a hearing on these alleged violations?

20    THE DEFENDANT:  Yes, Your Honor.  Yes.

21    THE COURT:  You understand that at such a hearing,

22  the government would be required to put on a witness or

23  witnesses --

24    THE DEFENDANT:  Yes, sir.

25    THE COURT:  -- to establish these violations by a

1    preponderance of the evidence?

2              THE DEFENDANT:  Absolutely, sir.  Yes, sir.

3              THE COURT:  Do you understand that Mr. Graham would

4    have the opportunity to cross-examine that witness or

5    witnesses?

6              THE DEFENDANT:  Yes, sir.

7              THE COURT:  And do you understand that at such a

8    hearing, you'd have the right to take the witness stand and

9    testify on your own behalf?

10             THE DEFENDANT:  Yes, sir.  Yes.

11             THE COURT:  All right.  Let's go over these four

12   violations.

13        The first alleged violation is you violated standard

14   condition No. 3, which states that you must not knowingly leave

15   the federal judicial district where you are authorized to

16   reside -- in this case that was the Eastern District of

17   Oklahoma -- without first getting permission from the court or

18   the probation officer.

19        The second alleged violation is that you violated

20   standard condition No. 4, which requires you to answer

21   truthfully the questions asked by the probation officer.

22        The third alleged violation is that you violated

23   standard condition No. 5, which requires you to live at a place

24   approved by the probation officer.  If you plan to change where

25   you live or anything about your living arrangements, such as

1   the people with whom you live, you must notify the probation

2   officer at least ten days before the change.  If notifying the

3   probation officer at least ten days in advance is not possible

4   due to unanticipated circumstances, you must notify the

5   probation officer within 72 hours of becoming aware of a change

6   or expected change.

7        And, finally, the alleged violation No. 4 is that you

8   violated standard condition No. 13, which requires you to

9   follow the instructions of the probation officer related to the

10  conditions of supervision.

11       And with the exception of this word "moved," are you

12  willing to stipulate, or agree, that you violated these four

13  violations?

14           **THE DEFENDANT:**  Absolutely, yes, sir, Your Honor.

15           **THE COURT:**  Let me rephrase that.  That you violated

16  these four conditions?

17           **THE DEFENDANT:**  Yes, Your Honor.

18           **THE COURT:**  All right.  As I understand, essentially

19  after moving -- let me avoid that word -- after situating

20  yourself at Wagoner Lake in your vehicle, you then left the

21  state of Oklahoma, and specifically the Eastern District of

22  Oklahoma, and you told Officer Murdock that you were in New

23  York.  Were you, in fact, in New York for a time?

24           **THE DEFENDANT:**  I had went to church in Tennessee

25  and then I went on into Washington and New York and then I just

1    turned around from New York and went on into Montana.

2                THE COURT:  All right.

3                THE DEFENDANT:  So I didn't stay in New York.  I

4    just went there to say, hey, I got there, you know, I made it,

5    basically I saw it.

6                THE COURT:  Right.  Okay.  And then you were asked

7    by Officer Murdock where exactly you were and where you were

8    going, and you would not give him your exact location and

9    stated that you apologized but you could not risk doing that.

10   Is that correct?

11               THE DEFENDANT:  Yes.  For being pulled over and

12   going back to jail when I'm not ready yet.

13               THE COURT:  I understand.

14               THE DEFENDANT:  Yeah.  It's --

15               THE COURT:  I understand.

16               THE DEFENDANT:  Not ready.  So --

17               THE COURT:  Okay.  How are you doing right now?

18               THE DEFENDANT:  Good.  I'm doing good.  Can I talk?

19               THE COURT:  Yeah.  Let me just ask before you do --

20               THE DEFENDANT:  Okay.

21               THE COURT:  -- it's my understanding that with the

22   Bureau of Prisons you had been put on a once-a-month injectable

23   called "Invega."

24               THE DEFENDANT:  Sure.

25               THE COURT:  And we've seen -- I'm certainly not an

1   expert in this -- but we've seen individuals who have responded

2   very well to that drug.  And I'm told by the probation officer

3   that at least your family had represented that you were

4   responding very well to that but that CREOKS, or however you

5   pronounce it, took you off that.

6           THE DEFENDANT:  Yes, sir.

7           THE COURT:  And at least there's some perception by

8   the probation office that you backslid in terms of your mental

9   health after being taken off of the Invega.  Give me your --

10          MR. GRAHAM:  My understanding if I can -- just to

11  inform the court about -- my understanding is the last time he

12  got Invega was in May of 2019 before he was released from DLM

13  and then CREOKS would never give it to him.

14          THE DEFENDANT:  Right.

15          THE COURT:  Well, that's consistent with -- I didn't

16  know the specifics but that's consistent with what was told to

17  me.  Okay.  Thank you.

18          MR. GRAHAM:  I just wanted to add to the timeline.

19          THE COURT:  Absolutely.  I appreciate that.

20          MR. GRAHAM:  Thank you.

21          THE COURT:  So give me your perception.  Because at

22  least based upon what you've said to me right so far, I see no

23  question as to competency.  But go ahead.

24          THE DEFENDANT:  Sure.  When I was in the prison, I

25  was diagnosed with the schizophrenia -- as a matter of fact,

1   can I back up to the courtroom?

2   　　　When I walked in the first courtroom after I was

3   arrested, the judge had pointed at me and said, "Mr. Trujillo,

4   you have a severe mental disorder."

5   　　　THE COURT:  Was that here in this courthouse?

6   　　　THE DEFENDANT:  That was not in this courthouse, not

7   -- or in this courthouse, yes.

8   　　　THE COURT:  Right.  But that was a magistrate judge?

9   　　　THE DEFENDANT:  That was a magistrate judge.

10   　　　THE COURT:  All right.

11   　　　THE DEFENDANT:  And to my understanding, the judge

12   has no right to diagnose anybody except for it to be by a

13   doctor.  And as I got to --

14   　　　MR. GRAHAM:  Springfield.

15   　　　THE DEFENDANT:  -- Springfield, that's -- yeah, I

16   went nine months without being even looked at as a mental case,

17   sir, as a mental patient, you know, with the comments that I

18   made over the phone.  They didn't see it as, you know, people

19   just get mad.  They asked me about it.  I said that I just got

20   mad, I got upset, I made a mistake, I apologize.  So they

21   didn't see any behavior patterns.

22   　　　There's three -- or what do they call them? --

23   statistics.  There's three behaviors that they're looking for

24   inside the mental home to diagnose you and to medicate you.

25   　　　THE COURT:  Three axes or something like that.  Do

1  you know the specifics?

2         **MR. GRAHAM:**  He's talking about an administrative --

3  he's talking about the administrative hearing on whether to it

4  force-medicate.

5         **THE COURT:**  I see.  Right.

6         **THE DEFENDANT:**  And that's what they done.  They

7  went to force medication.  I told Scott the story of why they

8  went there.  It wasn't for the three reasons why they would

9  force-medicate; it went to another reason.  Which I had wrote

10  up one of the doctors in there, Ms. Preston, did you get a

11  letter for PREA?  I wrote her up.  She made some comments

12  inside of the office and I was uncomfortable with the comments

13  that she made, you know.  I didn't take it any further but went

14  to PREA, wrote it up.  She found out.  She got scared, nervous.

15  This is where this -- I would like for the court --

16         **THE COURT:**  Based upon what comments?

17         **THE DEFENDANT:**  On -- I was in the office and she

18  says, "Mr. Trujillo" -- and she, you know, flirts, flips --

19  flips her hair and kind of flirtatiously says --

20         **THE COURT:**  Well, she's trying to gain your

21  confidence and trust.  So --

22         **THE DEFENDANT:**  That's scary for us because those

23  comments can put us in a hole as a prisoner that sees it in

24  there.  If you flirt back with them, those comments can make an

25  inmate go sit in a hole for --

1      THE COURT:  So did you, in fact, flirt back?

2      THE DEFENDANT:  Absolutely not.

3      THE COURT:  All right.

4      THE DEFENDANT:  I got up.  I left.

5      THE COURT:  So did she make those comments you're

6   saying?

7      THE DEFENDANT:  She made them, yes, sir.  She will

8   agree to what she said to me, sir.  And it was -- I wrote Scott

9   and told him that I need this -- I need you to see what

10  happened in here for what administered the medication on me.

11  It wasn't for the behavior -- of my behavior.  It was the fact

12  that I turned her in for the comments that she made.

13      THE COURT:  Oh, I see.  You reported her?

14      THE DEFENDANT:  I reported her as --

15      THE COURT:  I see.

16      THE DEFENDANT:  Yes.  And that went into the PREA.

17  And now --

18      MR. GRAHAM:  PREA as in the Prison Rape Elimination

19  Act.

20      THE DEFENDANT:  Yes.  Because it says -- and I

21  haven't been in jail for 17 years.  As I go in this prison, I

22  see on the paper -- or these walls, if anything happens, write

23  or contact PREA, contact the administrator, contact the

24  counselor immediately.

25      THE COURT:  All right.  But have you ever read "How

1    to Win Friends and Influence People"?

2              THE DEFENDANT:  Huh?

3              THE COURT:  You got to use a little bit of judgment.

4              THE DEFENDANT:  What do you mean?

5              THE COURT:  She's evaluating you.

6              THE DEFENDANT:  I haven't been to jail in 17 years

7    so I knew nothing about the PREA Act that even came out in the

8    prisons.  I didn't know that.  So when I heard that on the

9    PREA, I thought, Okay.  I will.

10             I went to an inmate and talked to him about it, and I

11   could even get his conversation about it if it goes to further

12   jury.  But I got his information and he said that this is what

13   we need to do.  So he wrote up a list -- because he's kind of

14   like the prison lawyer, you know, people go to them type of

15   guys --

16             THE COURT:  I'm well aware.

17             THE DEFENDANT:  Yes, sir.  Yes, sir.  So he wrote up

18   what I needed to talk to her about politely, you know, the

19   things that -- I do have that paper and further court dates

20   down the road.  If we go further, I will bring these in.

21             THE COURT:  All right.  That's water under the

22   bridge.

23             THE DEFENDANT:  Yes, sir.

24             THE COURT:  So she recommends --

25             THE DEFENDANT:  She got nervous.

1          THE COURT:   -- forced medication?

2          THE DEFENDANT:   She got a hold of Dr. Sarrazin.

3    Dr. Sarrazin agreed with her conversation about what her and I

4    did, that was uncalled for for me to write her up.  That's

5    where her and him obviously talked.  And he comes back into the

6    cell where I'm at.  She's with him.  They're standing outside

7    my window as I look out that little square in that hole.  After

8    another -- there was three PREA's that was written up on that

9    whole time that I was there.  Yes, sir.

10         THE COURT:   Well, you understand, though, that her

11   view is that she was not, in fact, doing what you alleged and

12   that it was a --

13         THE DEFENDANT:   She said I was a likable person,

14   Your Honor.

15         THE COURT:   All right.  But that it was evidence of

16   your mind that you were making these allegations; in other

17   words, that you were conjuring this up.  You understand that

18   that's a --

19         THE DEFENDANT:   I absolutely do.

20         THE COURT:   You understand that's a reasonable

21   position for her to take?

22         THE DEFENDANT:   That's her -- yes, absolutely.

23   Something to look into and not be standing firm or a hundred

24   percent on.  That would be something for her to you know -- or

25   others to look into at, is this could be the reason why she did

1    what she did or is this the reason why he did what he did.

2          Prior to that one, there was a guard.  One of the BOP

3    guards laid in on my bed.  On a cell-check, he laid in on my

4    bed and I saw him walking down the hall and I walked down from

5    the opposite direction.  I looked in there and I said, "What

6    are you doing, man?"  And he's laying on my bed -- and I don't

7    want to get vulgar about it -- or should I?

8                    **THE COURT:**  No.

9                    **THE DEFENDANT:**  Okay.  But he did a vulgar thing

10   about it.  And I said, "Why are you doing that, man?"  And it

11   wrote -- I wrote him up and they do have that information on

12   file.  I asked Scott if he would let you know, you know, the

13   paperwork that I had written up on these guys to let them know

14   what was going on.  Because that's what stemmed off of -- or

15   Ms. Preston saying that when I went into her office she said,

16   "Joe, you're a likable person," you know, and I thought I can't

17   -- I'm not going to get charged.  I'm not going to -- I feel

18   uncomfortable.  And it's not me being a weirdo, Your Honor;

19   it's me being safety in my own self.

20                   **THE COURT:**  All right.  So we have -- you're deep

21   into the weeds here.  But in any event, they forced medication,

22   the Invega; correct?

23                   **THE DEFENDANT:**  Yes, sir.

24                   **THE COURT:**  And your position is you didn't need it;

25   correct?

1    **THE DEFENDANT:**  Absolutely, yes.  It wasn't written

2    up for any of the three "criterias" that they recommend, the

3    three criteria, why you would be force-medicated.

4    **THE COURT:**  Okay.  Let me just say that what's

5    important to me right now is what your condition is as you

6    stand before me --

7    **THE DEFENDANT:**  Yes, sir.

8    **THE COURT:**  -- now.  It is not improper for a judge

9    to make that evaluation not for the ultimate purpose of

10   deciding your conditions or capacity --

11   **THE DEFENDANT:**  Absolutely.

12   **THE COURT:**  -- but for the purpose of sending you

13   for an evaluation; right?

14   **THE DEFENDANT:**  Sure, sure.

15   **THE COURT:**  And just so you know, I'm doing that

16   here.

17   **THE DEFENDANT:**  Okay.  Yes.

18   **THE COURT:**  All right.  Because there is some

19   question that's been raised to me about your psychological

20   condition and --

21   **THE DEFENDANT:**  I would like for you to hear the

22   full story before you would think that I would need another

23   evaluation for the psychological --

24   **THE COURT:**  Oh, absolutely.

25   **THE DEFENDANT:**  Okay.  Okay.

1            THE COURT:  Absolutely.  And I'm just reading from

2   Mr. Murdock's letter here.

3            THE DEFENDANT:  Yeah.  The spiritual part?

4            THE COURT:  Correct.

5            THE DEFENDANT:  Yes, sir.

6            THE COURT:  And I want you to know -- I mean, I

7   understand, you know, there's more to all this than just what

8   we see in front of us.

9            THE DEFENDANT:  Absolutely, absolutely.

10           THE COURT:  All right.  And I understand that.  But

11   the question is -- I mean, there's a line here between a

12   spiritual understanding that there is more than the strictly

13   material going on in this life.

14           THE DEFENDANT:  Sure, sure.

15           THE COURT:  On the other hand, someone can be

16   incompetent --

17           THE DEFENDANT:  Yeah.

18           THE COURT:  -- if they're on the other side of that

19   line and they see, you know, a demon behind every door --

20           THE DEFENDANT:  Sure, sure.

21           THE COURT:  -- right?  So that's in part what I'm

22   trying to evaluate here.

23           THE DEFENDANT:  Yes, sir.

24           THE COURT:  Go ahead.

25           THE DEFENDANT:  As I end up writing up three

1    PREA's -- I would like for you to have that brought into court

2    in the future possibly -- all three were 100 percent claims.

3    They weren't something that I imagined or see things happen.

4    The camera systems are rolling.  The guard -- one of the guards

5    got mad at the reason why I wrote one of the guys up for the

6    PREA and that's what caused me to go into the lockdown.

7        So once I was in the lockdown -- I'm going to skip from

8    the lockdown into this spiritual moment that you're talking

9    about here in Wagoner -- once I'm in the lockdown, that gives

10   Preston an opportunity to be able to come visit me.  She's back

11   there visiting me, her and Sarrazin.  They see that I'm not --

12   nothing's wrong.  Her and Sarrazin make up -- they make up

13   this -- come back in and they're standing at both sides of my

14   door and he's like -- because I could see him at this side and

15   I saw her at this side.  They're on the other side of the

16   windows.

17       THE COURT:  Okay.  Identify these two people.  Who

18   are they?

19       THE DEFENDANT:  Yes, I can.  Dr. Sarrazin and

20   Ms. Preston, Dr. Preston.

21       THE COURT:  All right.

22       THE DEFENDANT:  So they were trying to agree how

23   much medicine shall they give me.  This was after the forced

24   medication court hearing and this was after I came back.

25   Because they took me like this in the court.  I was already in

1    lockdown and so they me out of lockdown shackled into the

2    courtroom, force-medicated me through the judge, and then I

3    went back into the lockdown.  So that's when they came back in

4    and they're like, "How much do we give him?"  You know,

5    Sarrazin was pointing to her on this side of the door and he

6    was like -- she was like, "two, three, four," and he was like,

7    "five."  So they ended up going from 200 to 500 on medication.

8    I took that medication and literally went out.  I mean, it was

9    a powerful punch of medication.  I thought I'm not going to

10   take this no more.

11        There's more to the story, but I want to jump to this

12   point to where Ms. Alton and -- not Preston -- but Ms. Alton --

13   I'm out, you know, in Wagoner.  My landlord says -- you know,

14   the jobs and everything starts slowing down.

15        Ms. Alton says, "Why don't you go back to working

16   employment with hourly?"  I'm self-employed.  I build showers,

17   walk-in showers, custom walk-ins.  We talked about that last.

18   And Ms. Alton recommended me to go inside of a company and

19   start working with hourly wages.

20        I told her, "No.  I like doing what I do for a living."

21        My work normally does not dry out; it recommends

22   itself, okay?

23             THE COURT:  Right.

24             THE DEFENDANT:  I get in this house under

25   recommendations, underneath rules.  I live there, pay the

1    bills, work, I'm happy.

2          The spiritual point is, I'm very spiritual when it

3    comes time, when it comes time to my Lord, Jesus, my God,

4    versus what we're having to deal with in this nation

5    spiritually and demonically.

6          In the psychology department, it looks like that's what

7    comes through a lot to explain to the doctors, you know, the

8    Ph.D levels.  They see it as a mental disorder.  In my Bible

9    that I read, the Lord talks to us about how we fight a demonic

10   battle.  Sorcery becomes pharmacia -- or pharmacia, the

11   medicine.  That brings sorcery into all -- you know, it gets

12   deep.

13         So I'm real spiritual, not weird or not religious

14   spiritual, but I understand the sorcery that we're dealing with

15   versus, you know, the love of God that we're supposed to have

16   towards our enemies.  But at the same time, there's a spiritual

17   battle that we're fighting.  It's not against flesh and blood;

18   it's against principalities and powers and rulers of the

19   darkness of this world against spiritual wickedness in high

20   places.

21         So understanding the spiritual battle, it brings

22   against the psychology.  I don't believe in psychology.  I have

23   the Bible that helps me get through my religion.  And that's

24   what we talked about to the judge -- I think it may have

25   been --

1          MR. GRAHAM:   Judge McCarthy.

2          THE DEFENDANT:   -- Judge McCarthy.  He said that

3    it's going against his spiritual belief.  I don't -- basically

4    he says, I don't care.  We're going to force -- he didn't say

5    it -- but we're going to go ahead and force-medicate him.

6          I took that dose --

7          THE COURT:   Well, let me just ask your attorney

8    here.

9          THE DEFENDANT:   Yes.

10         THE COURT:   Did Judge McCarthy simply refer the

11   defendant for evaluation or did he actually order forced

12   medication?

13         MR. GRAHAM:   So both.  There was an original -- the

14   original recommendation or referral to the BOP for an

15   evaluation, then -- I mean, Mr. Trujillo was locked up, I think

16   it was 21 months, at Springfield, Your Honor.

17         THE COURT:   Which led to the 11(c)(1)(C).

18         MR. GRAHAM:   Correct.  Which was --

19         THE COURT:   Right.  But I take it Judge McCarthy did

20   so because the BOP had, in fact, determined that he needed that

21   forced medication and there were reports that he had made

22   progress under that forced medication?

23         MR. GRAHAM:   That's correct.  And we had a hearing

24   -- well, there hadn't been medication then there was a -- we

25   had a cell hearing from the prison, and Judge McCarthy heard

1    their evidence and our evidence and made a determination that,

2    in his opinion, Mr. Trujillo would benefit from forced

3    medication.

4            THE COURT:  I see.  Well, because I don't deal in

5    those proceedings --

6            MR. GRAHAM:  Right.

7            THE COURT:  -- those decisions are ultimately made

8    by the magistrate judge.  Is that correct?

9            MR. GRAHAM:  That's correct.

10           THE COURT:  Okay.  So that was well within his

11   purview.

12           MR. GRAHAM:  That's right.

13           THE COURT:  Okay.  I'm not one who --

14           THE DEFENDANT:  No.  I understand, totally

15   understand.

16           THE COURT:  I don't deal in those proceedings

17   normally.  Go ahead.

18           THE DEFENDANT:  So my behavior today with you is the

19   same behavior that I was speaking with Preston about and those

20   doctors.  Dr. Rice, the M.D., says, "Mr. Trujillo, you will not

21   be medicated here at this facility.  I don't see any criteria

22   that you will be medicated."  He did recommend that.  You can

23   have -- that's on -- he will tell you.

24           MR. GRAHAM:  So that's the different standard, Your

25   Honor.  They had the administrative dangerousness hearing.

1    They found Mr. Trujillo was not a danger so they couldn't

2    medicate him, which is why we had the cell hearing in front of

3    Judge McCarthy.

4              **THE COURT:** I see.  Okay.  Thank you.

5              **THE DEFENDANT:** So Ms. Preston gets very angry, I

6    mean, literally.  And I asked her -- I brought my Bible inside

7    that medication hearing, inside there.  I said, "Ms. Preston,

8    can I read a scripture to you, ma'am?"

9              And she goes, "No.  Get out."  I mean, it was -- there

10   was four people in that room when she said that, "Get out.  Get

11   out."  And I got out, okay?

12             Wagoner, there's a lot to that story.  In Wagoner, my

13   landlord came by.  I didn't have any money to be able to pay.

14   Ms. Alton wanted me to work with a full company to get paid,

15   you know, hourly.  That's not how I work.  I did go to work

16   when I first got out of prison because I needed to get back up.

17   I didn't have any clientele doing what I did so I went to work

18   with an employer.  Ms. Alton grabbed a hold of that saying that

19   that's where you did good.  After I left the employer after

20   about eight months, I went to work for myself.  Ms. Alton knew

21   I went to work for myself.  She was okay with it.  We are all

22   okay with it.  I was making good money.

23             Then the spiritual part, again, that I was dealing with

24   prior to talking to Ms. Alton in the Tulsa County Sheriff's

25   Office about making those phone calls when I was in Colorado,

1    those spiritual attacks that I was dealing with were attacking

2    me in Colorado, Montana, Utah.  Those are what led me to call

3    into the sheriff's office and I did ask for help.  There was

4    more than nine calls as they continued to say that I called.  I

5    called about 15 times asking for help.  What is going on?  Did

6    I do something in Tulsa County?  Did something go on?

7            They said that they only been watching me for six

8    years.  Nothing that they're watching me for was interesting to

9    arrest me with.  There's a story behind that one as well.

10           In Wagoner County -- I'm jumping -- in Wagoner County,

11   I'm sitting at the house being attacked the same way

12   spiritually, physically.  I mean, I'm lying my bed, Judge, and

13   I hear -- they say these voices.  These are spirits, okay?

14   It's not against flesh and blood.  And I know when we say that

15   to the psychologists, they'll say that you're mentally

16   disturbed.  They don't believe in the Bible.  We don't believe

17   in their psychology work.

18           The spiritual realm, when you're tuned in you do

19   spiritually hear things going on in the spiritual realm.  It

20   does sound like it's a little -- if you talk to spiritual

21   advisers, they'll tell you the same thing.  There are spirits

22   that are very mean, very powerful.

23           **THE COURT:**  All right.  Let me cut you off there.

24           **THE DEFENDANT:**  Yes, sir.  Go ahead.

25           **THE COURT:**  I mean, your previous sentence was based

1    on a number of statements that you had made which clearly are

2    on the other side of the line.  You called the Tulsa area 911

3    line on March 21st, 2017, and stated that the Tulsa County

4    Sheriff's Office had planted a tracker in your leg and that you

5    would -- and I apologize for the language but it's yours --

6    "kill those motherfuckers."

7              **THE DEFENDANT:**  I understand, Your Honor.

8              **THE COURT:**  Then on April 24th, 2017, you called the

9    Tulsa County Sheriff's Office and told a dispatcher that the

10   sheriff's office had planted chips inside you; specifically, in

11   your leg and behind your eyes, and that you would blow the

12   office up with a bomb "like 9/11."

13             Then on May 3rd, 2017, you called the United States

14   Marshal Service for the Northern District of Oklahoma and

15   threatened to blow up the federal courthouse.  During the call,

16   you again made references to the chip that was implanted in you

17   by government authorities.

18             On June 20th, 2017, you used the Facebook application

19   to make a post on the public Web site of the Akdar Shrine

20   located in Tulsa, Oklahoma.  You accused the Shiners of

21   conspiracies, murders, and pedophilia and threatened to use

22   explosives against both the Shrine itself and the parades held

23   by the Shiners.  You further threatened to cut the individual

24   Shiners "from ear to ear and gut them."

25             On June 27th -- and I'm skipping over one of these

1  incidents -- you called the court clerk's office for the

2  Northern District of Oklahoma and declared that everyone should

3  get out of the federal courthouse because it was, quote, about

4  to go up in flames.  There are five or six other statements

5  that are equally --

6              THE DEFENDANT:  Sure.

7              THE COURT:  -- disturbing and problematic and

8  clearly indicative of mental health problems.

9              THE DEFENDANT:  Absolutely.

10             THE COURT:  All right.  I mean, there's a line

11 between understanding scripture and making these kind of

12 statements.  You understand that?

13             THE DEFENDANT:  Absolutely, Your Honor.  And I have

14 a very well answer -- perfect answer for what you just gave me.

15             THE COURT:  All right.

16             THE DEFENDANT:  My behavior was unacceptable, and

17 that's exactly what I told those people, you know, to the

18 counselors, to Ms. Preston.  I told them it was "unbehavior" --

19 I mean, unacceptable.

20             I'm not perfect.  I made a mistake.  The attacks that I

21 was literally receiving out in Colorado, these were nothing but

22 demonic attacks.  It's not that I'm a bad person.  It was

23 literally somebody from Oklahoma throwing those demonic attacks

24 on me even outside the state, which I didn't understand.  You

25 know, I didn't have any warrants out for my arrest.  I wasn't

28

1   in trouble.

2        So those calls -- there was at least four to five more

3   calls prior to those violent calls.  That's what I wanted to

4   talk also about.  Those calls were, hey, what's going on Tulsa

5   County sheriff's?  Well, we don't do that type of behavior,

6   sir.  Okay.  That's fine.

7        I called the U.S. marshals.  You know, am I up

8   underneath an arrest?  I had calls asking what's going on.

9   That wasn't just calling in and just blowing them up.  That was

10  them -- actually one of the calls, the lady laughed at me, and

11  I thought, Ma'am, this ain't funny.

12       THE COURT:  Okay.  So all of that again is water

13  under the bridge.  We've already sentenced for that.

14       THE DEFENDANT:  Yes, sir.  Yes, yes.

15       THE COURT:  My question is -- let me pose this to

16  Mr. Faerber -- is there any behavior consistent with that which

17  I just read that should concern me now such that I should send

18  Mr. Trujillo in for another evaluation to your knowledge?

19       MR. FAERBER:  Well, Your Honor, I think there could

20  be.  And I want Mr. Trujillo to understand that I've talked to

21  Mr. Litchfield.  From our perspective, what we're interested in

22  is your health.

23       THE DEFENDANT:  Yes, sir.

24       MR. FAERBER:  Okay.  We want you to be the best you

25  can be.  You've admitted you've had some mental problems just

1    now with the judge.  That's a physical problem with the brain.

2    And so if we have mental problems, it's hard for us to see it,

3    right, because our mind's not working right.

4          So what I propose -- you've got broad powers, Your

5    Honor, if I may.  You've got broad powers based on supervised

6    release.  You're on supervised release right now, and the court

7    can order some treatment and evaluation to make sure that there

8    isn't something wrong with your brain.  If there is and if you

9    can get some treatment, it's going to help you.  It's going to

10   help you in your spiritual life.  It will help you in your

11   physical life.  And I know Mr. Trujillo's aware from his

12   reading of the Bible that Jesus himself healed a lot of

13   people's bodies.  So you got to get your body right.

14         So I think from the colloquy you've had with

15   Mr. Trujillo from the past instances, from the letter, I think

16   it's within your broad powers on supervised release to order an

17   evaluation to make sure that if there's anything wrong with

18   Mr. Trujillo physically, that he can receive the treatment to

19   be the best person, the healthiest person, the best functioning

20   he can be, if that makes sense.

21         **THE COURT:**  Mr. Graham, you're obviously in a

22   situation that you're counsel to Mr. Trujillo so it's a -- you

23   have to represent his interests here.  And I'm certainly not

24   going to order today any forced medication.  I mean, that's not

25   -- that's not even before me.

1    MR. GRAHAM:  Right.

2    THE COURT:  And it's clear that his behavior is such

3    -- and I can make the finding here on the record -- that

4    Mr. Trujillo violated the terms of his supervised release and

5    we're going to hold him pending sentencing.  I further find

6    that he has adequately and fully waived his rights to a

7    contested hearing today.

8    The question before the court is should he be, based

9    upon these statements in Mr. Murdock's letter, referred for

10   further mental evaluation.  And realizing that you represent

11   Mr. Murdock here --

12   MR. GRAHAM:  Like an Occam's razor, Judge.

13   THE COURT:  Right.  I understand.  And I fully

14   understand the difficulty there.

15   MR. GRAHAM:  What I can tell Your Honor for sure is

16   that, if you recall, at Mr. Trujillo's sentencing in October,

17   we were talking about what a great success story that

18   Mr. Trujillo had been.  He at the time was working at the

19   Muskogee Creek casino drywalling from the flood and getting

20   that place back up and ship shape and --

21   THE DEFENDANT:  Yes, sir.

22   MR. GRAHAM:  And I have seen, and I think we might

23   have shown pictures to you, about his tile work, Your Honor,

24   and it's beautiful.  And we were all -- Mr. Litchfield, myself,

25   Ms. Livingston, we were all talking about what a great success

1  story Mr. Trujillo was at the time, and that was after several

2  months of the medication in Springfield.

3      And then for whatever reason, because of our contracts

4  in CREOKS and Mr. Trujillo's financial situation, he stopped

5  going to CREOKS in Wagoner County and CREOKS doesn't give him

6  any medicine.  So we're standing before you -- a quick

7  calculation -- about 14 months since the last time he's had

8  that medication and, you know, in some ways it's not a surprise

9  that here we are.  I'm glad it's only for leaving the district

10  and going fishing without a license.  But, you know,

11  Mr. Trujillo doesn't feel like he needs to be medicated and

12  that's his position.

13      I will tell Your Honor that I spoke with Mr. Trujillo's

14  mother who has wanted me to tell you that she intended to be

15  here today, much like when she was here for sentencing in his

16  original change of plea.  She's been at every hearing up until

17  today, but with COVID she decided she couldn't.  Otherwise, she

18  would be here to support Your Honor's decision and certainly

19  Mr. Trujillo in whatever happens but --

20          THE COURT:  All right.  I'm going to pass this

21  matter for three weeks for sentencing.  Procedurally, I am not

22  prepared to send Mr. Trujillo for evaluation absent an

23  application by the government to do so.  So should the

24  government decide that it believes it necessary to have

25  Mr. Trujillo evaluated, I'm directing the government to file

1  such a motion; if not, then we will proceed to sentencing here

2  in three weeks.

3          Karen, could you give us a date?

4          **DEPUTY COURT CLERK:**  Yes.  We could do August 11th

5  at 10:30.

6          **THE COURT:**  All right.  Good date?

7          **MR. GRAHAM:**  Yes, Your Honor.  I think I'm here on

8  that date anyway.

9          **THE COURT:**  Mr. Trujillo, where are you at, David

10 Moss, sir?

11         **MR. GRAHAM:**  Payne County.

12         **THE DEFENDANT:**  Payne County, sir.

13         **THE COURT:**  Okay.  I understand that's actually

14 working out rather well.  How is it --

15         **THE DEFENDANT:**  It's not.  It's in jail.  I'd rather

16 be working, living my life, like everybody else in this

17 courtroom.  Can I say one more thing, Your Honor?

18         **THE COURT:**  Of course.

19         **THE DEFENDANT:**  That medication -- that doctor at

20 CREOKS looked at me, just like you're looking at me, and she

21 says, "Mr. Trujillo, you are not going to be medicated out

22 here."  She goes, "If that judge has a problem with what I'm

23 recommending, have him to let me know and I'll write him a

24 letter."

25         Judge, we make mistakes and I feel like I'm getting

1  condemned because of a mistake that I made and there's no

2  justice on my behalf.  I'm just like you all.  I pay my bills.

3  I pay my taxes.  I get out and work from 7:00 a.m. to

4  5:00 p.m., 6:00 p.m.  I work hard.  That woman over there sees

5  my work every time she comes out.  He sees it.  My family is

6  supporting with whatever you all decide.

7            But we know that ultimately the Lord's in charge with

8  this behavior because it's going to open up a door to the

9  backside where everyone wants that door shut and they don't

10  want that behavior to be seen through this system, okay?

11  There's nothing there other than the behavior inside of BOP,

12  the behavior out here in the courts, the police department's

13  behavior.  Those behaviors are just like mine.  We make

14  mistakes.  I made a mistake.  I'm being pounded.

15            THE COURT:  Well, your previous mistakes that led to

16  the sentence before this court --

17            THE DEFENDANT:  Absolutely, absolutely.  And I took

18  it as a man.  I took it as a man.

19            THE COURT:  Well, but they were clearly indicative

20  of mental problems at that time.

21            THE DEFENDANT:  And against God's nature.  Because I

22  am a Christian in the Bible and I do preach the word of God.

23  I'm a prisoner minister.  I go in and preach, like I said.  It

24  doesn't matter how "indictive" -- or vindictive they are.  I

25  made a mistake.  We all make mistakes.  Sometimes husbands get

1    mad at wives because they come in at 3:00 in the morning from a

2    girlfriend party, they kill them.  You know what I mean?  Yes,

3    we know that that happens.  We make mistakes.  That's where we

4    need to recognize today as, please see that it's not a mental,

5    it's a spiritual battle that we Christians have.

6         I brought it to Scott, my mother's a spiritual woman.

7    She's very powerful in her belief with Christ.  Myself, I fight

8    more of a battle out there than just being a Christian, you

9    know, because I'm deep with God's word and I made a mistake.

10   So --

11        **THE COURT:**  All right.  Is there anything else we

12   need to address here today?  Mr. Graham?

13        **MR. GRAHAM:**  No, Your Honor.

14        **THE COURT:**  Mr. Faerber?

15        **MR. FAERBER:**  No, Your Honor.

16        **THE COURT:**  All right.  Thank you very much.  We are

17   in recess.  Thank you, sir.

18        **THE DEFENDANT:**  Thank you.

19              *(The proceedings were concluded)*

20

21

22

23

24

25

C E R T I F I C A T E

        I, Brian P. Neil, a Certified Court Reporter for the
Northern District of Oklahoma, do hereby certify that the
foregoing is a true and accurate transcription of my
stenographic notes and is a true record of the proceedings held
in above-captioned case.

        I further certify that I am not employed by or related
to any party to this action by blood or marriage and that I am
in no way interested in the outcome of this matter.

        In witness whereof, I have hereunto set my hand this
5th day of August 2020.


                                s/ Brian P. Neil
                        _____
                          Brian P. Neil, RMR-CRR
                          United States Court Reporter